Savage agt. Gould *et al.*

## SUPREME COURT.

EDWARD SAVAGE, as executor, &c., appellant, agt. MARY L. GOULD *et al.*, respondents.

*Executor and testamentary trustee — Power of surrogate to remove trustee for dishonesty — What is evidence of improvidence and dishonesty.*

Delegation to others the exercise due from a trustee of his judgment is evidence of incompetency.

So is the investing of trust funds on second mortgages and conversion of good securities for reinvestment.

Surrogates finding, that the taking of commissions on loans made by a trustee or by his partner for him, is evidence of dishonesty warranting a removal, approved.

*Emerson* agt. *Bowers* (4 *N. Y.*, 449) distinguished.

Surrogate may remove testamentary trustees (*Contra : Blake* agt. *Sands,* 3 *Redf.*, 168).

Chapter 79, Laws 1873, giving surrogates power to remove executors for dishonesty construed, with chapter 482 of 1871, as giving similar jurisdiction over testamentary trustees.

*Third Department, General Term, January,* 1880.

THIS was an appeal brought by an executor and trustee. The decree made by the surrogate upon the petition of the widow of the testator and beneficiary under the. trusts and also mother of the other respondents who are infants and children of deceased, praying in her own and their behalf for his removal from said offices for his incompetency as improvident and dishonest. Upon this petition a citation was issued to appellant to show cause why its prayer should not be granted. He answered, denying the petitioner's charges. The surrogate found the charges to be true, and made the order here under review, removing said appellant from said offices of executor and trustee. He appealed to the court, charging the decree to be erroneous in every part. By the will, which was admitted to probate Albany county, December 14, 1874, deceased gave to his executor power to sell all real estate

" of which he might die seized, or possessed," in his discretion. After some few minor bequests, the will directed the executor to divide the remainder into five equal shares, and be devised to such executor one of such equal fifth parts for each of his five children by separate devises, the same to be " in trust forever ; to invest and reinvest the same in good bonds and mortgages, and collect the interest and income thereof, and out of the same to pay for the education, proper and reasonable support and maintenance of said child, and invest for his or her advantage whatever balance of such interest and income there may remain after paying the same on good bonds and mortgages." The inventory showed the estate to consist of fourteen first mortgages, of $31,350, and about $53,395.37 government bonds, and about $42,000 first mortgage railroad bonds of higher per centage and equal standing with the governments. The total of the inventory was about $176,000, and No. 80 Dove street. Appellant accepted the execution of these trusts. In March, 1875, he associated with himself C., a law partner, who was a Pennsylvanian ; had neither done business, nor resided, nor owned real estate in this state, excepting a temporary residence of a year and a-half, about 1865, in New York city as a law clerk and broker, and at the time of these occurrences was bankrupt and unable to take property in his name. Appellant would inform C. that there were, or C. would ask if there were, moneys to loan. These bonds would be placed in the market, and the proceeds invested on many worthless and many nearly worthless mortgages. The mortgagor would see C. and deal with him, only paying no attention thereto and referring applicants for loans to C. It was C.'s custom to negotiate the investments, and the appellant delivered the money to him to loan and took his receipt substantially as follows :

" Received, Albany, N. Y., April 9, 1875, of S., executor and trustee, $1,500, to be loaned to Joseph Fellows for one year from date thereof, on bond and mortgage.

(Signed.) " T. L. C."

C. would inspect the property and report his opinion on behalf of mortgagor to S., generally alone, and only in a few instances did S. claim to have made personal inspection on the property, and admits in twenty-two mortgages of $35,100, where he simply let the mortgagor and C., whom he claimed did not represent him but the mortgagor, and who had no experience in real estate, fix the sufficiency of property as security, arrange and complete the loan, S. taking no part therein after paying over the money to C. to be loaned, and then shared the bonus received on the loan. C. would pay by his check to the mortgagor the amount, less the bonus, usually of large per cent, receive the bond and mortgage and deliver them. These bonuses were down to May 3, 1876, always turned over by C. to the appellant who was treasurer of S. and C., and then from time to time divided equally between them as partnership funds. Afterwards a change of procedure took place. To avoid objections they concluded the appellant should not receive directly any of the bonuses, but that they should be applied to the payment of the expenses of the firm of S. & C.

The estate, as it came to the trustee's hands, could be inexpensively managed and only required his services. The evidence tended to show that the financial distresses of the country which struck down the value of real property started in 1873, and, in the city of Albany and vicinity, had accomplished the great reduction before the investments, to which exception was taken, were made by the trustee. Of about $107,000 mortgage investments but about $30,000 was productive.

*Charles W. Mead* and *Edwin Countryman*, for appellants.

I. The surrogate had no jurisdiction to entertain the application to remove the testamentary trustee for dishonesty in the mangement of the trust estates. Under chapter 482 of Laws of 1871, power is conferred on the surrogate to remove testamentary trustees " in the same manner as now (1871) provided" for the removal of executors or administrators, and

Savage agt. Gould *et al.*

for the removal of testamentary guardians the same as other guardians (1 *Laws of* 1871, *page* 1010). 1. As the law existed in 1871, the surrogate had no authority to remove an executor or administrator for "dishonesty." The only ground of absolute removal under the Revised Statutes was "that he had become incompetent to serve" (2 *Revised Statutes*, 72, *sec.* 18; *Id.* 75, *sec.* 32). And "incompetency" was then defined by statute, so far as applicable here, to be merely such unfitness as was caused "by reason of drunkenness, improvidence or want of understanding" (2 *Revised Statutes*, 69, *sec.* 3). And it was distinctly held that such incompetency did not include misconduct or mismanagement on the part of the trustee in his official relations to the trust, nor his personal insolvency, but referred rather to his general habits of mind and conduct and the want of ordinary care and forecast in the acquisition and preservation of property (*Emerson* agt. *Bowers*, 14 *N. Y.*, 449, 454, 455). 2. In 1873 the above section of the Revised Statutes relating to executors was amended by inserting the word "dishonesty" between "drunkenness" and "improvidence," in the definition of incompetency (*Laws of* 1873, *chap.* 79, *p.* 159). 3. But this subsequent amendment of the Revised Statutes in relation to executors did not modify or affect the prior act of 1871 relating to testamentary trustees. The authority to remove such trustees is only to be found in the act of 1871, and it necessarily follows that the jurisdiction of the surrogate is limited to the exercise of such power as was contemplated and conferred by that act. Without reference to the language of the act, it is apparent that it must have been passed with express reference to the provisions of the Revised Statutes then in force. And the rule is elementary in the construction of statutes that whatever is within the spirit and intent is within the statute, even if against the letter (*People* agt. *Utica Ins. Co.*, 15 *Johns.*, 358; *Jackson* agt. *Collins*, 3 *Cow.*, 89 ; *White* agt. *Wager*, 32 *Barb.*, 353; *Smith* agt. *People*, 47 *N. Y.*, 330). But the terms of the act of 1871

are clear and explicit. The same "power and jurisdiction" is given for removing testamentary trustees "as now provided" for "the removal of executors," &c. And nothing more could be given by any reference to existing laws, unless it were conferred by the terms of the act itself, of which there is no pretense. 4. This rule has been frequently applied in analogous cases. It was provided by statute in 1837 that costs in surrogates' courts should be taxed under the common pleas fee bill then in force and contained in the Revised Statutes (*Laws of* 1837, *p.* 536). And although that fee bill was repealed or modified in 1840 (*Laws of* 1840, *p.* 336, *sec.* 40), and that court was abolished by the constitution of 1846, and entirely new rates of costs were adopted by the Code, it has been repeatedly held that the old common pleas fee bill remained in force for the cases provided for in the act of 1837 (*Western* agt. *Romaine*, 1 *Bradf. R.*, 37; *Wilcox* v. *Smith*, 26 *Barb.*, 316, 330; *Davis* v. *Patchin*, 25 *How.*, 5; *Same Case*, 26 *N. Y.*, 441, 448). So, in mandamus cases, costs were first authorized in 1833 (*Laws of* 1833, *p.* 395, *sec.* 6), when the old fee bill contained in the Revised Statutes was in force; and, notwithstanding that fee bill was expressly repealed in 1840, and a new fee bill adopted, and again, in 1848, entirely new rates of costs were provided for in the Code, it was held, in 1863, that costs in such cases were still to be taxed under the old fee bill of the Revised Statutes (*People* agt. *Commissioners of Highways*, 28 *How.*, 159). 5. The surrogate is a creature of the statute. His jurisdiction is special and is limited to the powers expressly conferred in the statute (*Corwin* agt. *Merritt*, 3 *Barb.*, 341; *Cleveland* agt. *Whitor*, 31 *Barb.*, 544; *Furniss* agt. *Furniss*, 2 *Redf.*, 497.) 6. The petition and order for removal of the trustee are based upon the charge of incompetency by reason of "improvidence and dishonesty," and as there is no evidence of improvidence, and the surrogate had no power to pass upon the question of dishonesty, it follows that the order must be reversed.

II. The evidence clearly failed to establish the charge of improvidence against the trustee. None was given or offered to show his general character· or habits in this respect. The evidence merely tended to show miscalculation or mismanagement on his part, not wanton or reckless improvidence. This point has been expressly adjudged (*Emerson* agt. *Bowers* 14 *N. Y.*, 449).

III. Nor is there any proof of dishonesty. What is dishonesty? It is clearly something more than improvidence, as defined by the Court of Appeals in *Emerson* agt. *Bowers* (14 *N. Y.*, 449). And it is something more than misjudgment, mismanagement or misconduct on the part of the trustee. He may mismanage the trust, or misconduct himself, from misapprehension or mistake, and with the best intentions. Dishonesty is equivalent to fraud, collusion and corruption, and implies not only a wrong act, but a bad motive, as the incentive to the act. 1. It was the duty of the appellant as executor and trustee, with general power under the will, to invest and reinvest the personal property; to collect in the personal securities and investments made by the testator in private stocks, and invest the same in real estate securities within a reasonable time, at least within the eighteen months allowed for settling the estate (*Gillespie* agt. *Brooks*, 2 *Redf.*, 349; 1 *Perry on Trusts, sec.* 440). 2. There is no evidence in this case as.to the conduct of the appellant in regard to business generally, as to his general character or business habits for knavery or dishonesty. 3. In determining the question of "dishonesty," it is necessary to take a general survey of his management of the estate, and consider particular acts in the light of his general conduct; in other words, to judge him by his general course of proceeding, and not by a few isolated transactions. The results of such a survey of the management of this trust clearly shows that in the matter of converting the assets into money and reinvesting the same in bonds and mortgages nearly $9,000 was gained to the estate. Again, the aggregate amount of assets thus converted into money

and invested in bonds and mortgages, saying nothing of sub sequent reinvestments, was over $138,000, secured by forty-six different securities. Of these investments, there is not a whisper of dissatisfaction in reference to twenty-two of the securities. And there is only a faint murmur against fifteen of the other mortgages, while the evidence is overwhelming to show that they were entirely safe and judicious. The average valuation of all the witnesses, shows that the property in each case was worth from 50 to 100 per cent more than the loss. 4. There are only nine in all of the investments that are seriously attacked, and of these the surrogate has specified six as worthless or inadequate securities. For the evidence relating to these contested securities, their value and the circumstances under which they were taken, and the precautions of the trustees, see preliminary statement of facts. 5. These investments were made during a period of great financial depression, a period of such confusion and uncertainty that real estate can hardly be said to have a settled or market value. There was a continual decline in the value of real estate during all these years, and the lowest point was only reached about the time of this investigation before the surrogate. 6. " A trust is an office necessary in the concerns of life between man and man and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, and it is an act of great kindness in any one to accept it. If there is no *mala fides*, nothing willful in the conduct of the trustee, the court should regard all his acts with a favorable eye " (*Shields* agt. *Shields*, 60 *Barb.*, 61.; *Thompson* agt. *Thompson*, 2 *B. Mon.* [*Ky.*], 175, 176; *Witner's Appeal*, 87 *Penn.*, 120). 7. No effort was made to show the fees charged by Mr. C. for the services he rendered to applicants for loans, was unreasonable or extortionate.

IV. The surrogate erred in excluding evidence to show what information the trustee received and acted upon in making particular investments, thus shutting off one of the most important, in fact the only way of showing that he acted with

reasonable and ordinary prudence. The evidence of sales of other property similarly situated, in the immediate vicinity, was material to show the good faith of the trustee in his estimates of the property in question.

*Alva H. Tremain* and *Andrew Hamilton,* for respondents.

I. The surrogate had power to remove appellant and to make decree appealed from. (*a*) The surrogate may remove an executor whom, upon proof, he shall adjudge incompetent to execute the duties of such trust by reason of improvidence or dishonesty and other reasons enumerated (3 *Rev. St.* [6 *ed.*, *p.* 75], *secs.* 19 *to* 22; *Redf. Sur. Pr.*, 144; This power is possessed exclusively by the surrogate's court, it being only conferred upon it by statute (3 *Rev. St.* [6*th ed.*], *supra; Perry on Trusts, vol.* 1, *sec.* 281; *Wood* agt. *Brown,* 34 *N. Y.*, 342). (*b*) And in 1871 was added same power to remove testamentary trustees (*Chap.* 782, *Laws* 1867, *sec.* 1; *chap.* 482, *Laws* 1871; *Redf. Sur. Pr.*, 424, 425; 3 *Rev. St.* [6*th ed.*], *p.* 106, *sec.* 100; *Hetzell* agt. *Barber,* 6 *Hun,* 534; *Savage* agt. *Olmstead,* 2 *Redf.*, 479; *Furniss* agt. *Furniss,* 2 *Redf.*, 497). (*c*) These powers may be exercised when the two offices of executor and trustee unite in same person, under one instrument, and a decree removing from both made on the one petition and proceeding (*Wood* agt. *Brown,* 34 *N. Y.*, 342). Improvidence and dishonesty is sufficient cause for a denial of letters testamentary to one named as executor (3 *R. S.* [6*th ed.*], *p.* 73, *sec.* 3). And if he becomes such after appointment he can then be removed (3 *R. S.* [6*th ed.*], *p.* 75, *secs.* 19 *to* 23). Complaint may be made to the surrogate by any person interested in the trust (3 *R. S.* [6*th ed.*], *p.* 75, *sec.* 19; *Dayton on Sur.*, *p.* 644). The constant tendency of the courts and legislation, for a long time, has been to give a liberal and extended construction to the powers and jurisdiction of surrogates' courts. That they should have plenary power for the controlling, preservation and management of estates of deceased persons, and the multiform questions

appertaining thereto, upon accounting and removal (*Chap.* 272, *Laws* 1860, *and chap.* 115, *Laws* 1866; *chap.* 782, *Laws* 1867, *sec.* 1; *chap.* 482, *Laws* 1871; *Redf. Sur. Pr.*, 424, 425; 3 *Revised Statutes* [*6th ed.*], *p.* 106, *sec.* 100; *Hartnett* agt. *Wendell*, 16 *Abb. Pr.* [*N. S.*], 383; *Campbell* agt. *Thatcher*, 54 *Barb.*, 382; *Dobke* agt. *McClaran*, 41 *Barb.*, 491; *Sipperly* agt. *Baucus*, 24 *N. Y.*, 46; *Brick's estate*, 15 *Abb.*, 12; *Hetzell* agt. *Barber*, 6 *Hun*, 534; *Savage* agt. *Olmstead*, 2 *Redf.*, 478, *and see id.*, 497).

II. The evidence shows the appellant incompetent to execute the duties of these trusts by reason of improvidence. (*a*) Improvidence is defined as "want of providence or forecast, neglect of foresight or of the measures which foresight might dictate for safety or advantage, not providing for or against what will happen in future time, negligent, thoughtless. Half the inconveniences and loss which men suffer are the effects of improvidence" (*Webster's Dictionary*). And the same, with "neglect of preparation, imprudence, prodigal, wasteful" (*Worcester*). Its synonyms are "inconsideration, negligence, carelessness, heedlessness" (*Webster*). "Providence" (from *pro* and *video*), the want of which, constitutes improvidence, is defined as synonymous with "caution, carefulness, prudence, frugality, economy" (*Webster*). As employed in this statute it has been held to mean "that want of care and foresight in the management of property which would be likely to render the estate and effects of the intestate unsafe and liable to be lost or diminished in value" (*Coope* agt. *Lowerre*, 1 *Bar. Ch.*, 45; *Coggshall* agt. *Green*, 9 *Hun*, 471; *Emerson* agt. *Bowers*, 14 *N. Y.*, 449). (*b*) It is said in *Coope* agt. *Lowerre*, and also in 14 *N. Y.*, 449, that this imprudence or improvidence must be established as of the habits of mind and conduct, and not based on individual instances. How are they to be shown, when the regular avocation of the party does not necessarily determine them? A good lawyer may be, withal, a very improvident person in financial matters and "management of property," to which

alone the term improvidence must here be held to apply (*See Coope* agt. *Lowerre, sup.*). The well-known history of the bar furnishes examples of this truth, both numerous and illustrious. Where the ordinary business occupation of the individual affords no reliable test of his habits and conduct in these respects, the determination of these questions must depend upon the evidence of his capacity and conduct in other fields, which do afford a fair index. The best, the only method left, and we submit it is a most convincing one, is the examination of his conduct and habits during a period of three years, down to the date of these proceedings, in the capacity of sole executor and trustee and manager of an eastate of nearly $200,000, and where full opportunity was given him to display his habits and character of mind, and to make or mar his reputation for providence. (*c*) The definitions of improvidence, cited above, are those which must interpret its meaning in this statute, inasmuch as there is no distinct or different legal signification. The case of *Emmerson* agt. *Bowers* (14 *N. Y.*, 449), does not conflict with the respondent's position. It is merely an authority holding that a single act (and there was in that case but one proceeding on the trustee's part shown, being the surrendering up of the control of the trust to the charge of one who, for all that appears in the case, may have been a very competent person), was not the degree of improvidence intended by the statute. That one act of negligence did not sustain the charge of improvidence. The other evidence in that case, such as the taking of the moneys by the trustee himself, and the prosecution of fruitless appeals that the funds might be exhausted in litigation for the attorneys' benefit, were evidence of fraud and dishonesty, not of improvidence; of a wicked purpose, and not an indifferent or incompetent regard; and for these causes the surrogate at that time possessed no power of removal, but has been therewith since invested (*Coggshall* agt. *Green, supra*).

III. The appellant was incompetent to discharge the duties

of these trusts by reason of improvidence, as shown by the evidence in — First. He was shown to be improvident in his conversion of the estate and investments left by the deceased, without good cause therefor; also in not dividing the estate into five shares as directed by the will, and which could readily be done when in government, railroad and other first-class bonds and mortgages, and instead of which he destroyed the power of division, owing to the uncertainty of value of new securities and indivisibility of real estate. (*a*) The will gives express power to sell and invest proceeds of real estate of which testator died seized or possessed. The giving of express power and confining it to real estate of a particular class, and saying nothing as to the personal estate, conclusively shows that the testator was content with his other securities, and did not intend to direct their conversion. The rule is well settled that the naming of one portion of the estate is the exclusion of the other, in the well known maxim, "*Expressio unius est exclusio alterius.*" The will in other places gives him power " to invest and reinvest in good bonds and mortgages," and the funds thus to be applied would be derived from the sale of the real estate as specially authorized, and from securities that should fall due, or be called in, or paid to the trustee, and from any surplus income after support and maintenance of children. The testator's government bonds are, within the law, the safest security, with a certain revenue, inexpensive as to care or collection, untaxed (*King* agt. *Talbot*, 40 *N. Y.*, 77). These he converted the very first. Of equal security were the first mortgage railroad bonds, drawing six and some eight per cent, some gold, and some in currency. These he converted, leaving stock, a poorer security, unconverted. None of the governments had been called in and most were not due until 1887, consequently their sale, and that of the others was in violation of his powers under the will. If it is said, he considered himself as commanded by the will to sell the securities and invest in bonds and mortgages, he has been further derelict, for he has never attempted to carry out that direction by dis-

posal of the remaining securities, of about $38,000, left by the testator, and which might, with more propriety, have been disposed of. If the direction of the will was positive, he was bound to convert all (*Tiff. on Trusts*, 629, 630, 632). (*b*) The will at most, in regard to converting securities, is but permissive. When there is no command directing the conversion, the trustee must act in utmost good faith, and, though power is given him in his discretion, it will not authorize a change with a prospect of benefiting the estate (*Tiffany on Trusts*, 614, 615, 78, 79; *Perry on Trusts, vol.* 1, *sec.* 466). If unauthorized by the will, the trustee's acts were a wrongful conversion. If allowed by the will, being without a prospect of benefit to the estate and for his own gain, it was equally improvident. If directed by the will, his failure to invest in good bonds and mortgages was equally a violation of his powers most improvident in its character. Second. The appellant by his investments showed himself incompetent by reason of improvidence. (*a*) It was his duty as trustee to see that the investments were secure, productive of interest, and subject to future recall (*Ackerman* agt. *Emmott*, 4 *Bar.*, 626; *King* agt. *Talbot*, 40 *N. Y.*, 76, 86, 88; *Affirming same case*, 50 *Barb.*, 453, 484; *Tiffany on Trusts*, 587, 600, 601, 602, 603; *Ackerman* agt. *Emmott*, 4 *Barb.*, 626; *Smith* agt. *Smith*, 4 *John. Ch.*, 281; 4 *Edw. Ch.*, 718). From, as we claim, illegal conversion of first-class securities of about $107,000 invested, but about $32,000, on January 21, 1878, were paying investments. The balance yielded not more than sufficient income to discharge the expenses of their own management. The principal has been exhausted in their maintenance to $7,119.66. The interest was lost instead of being secured; the principal was sunk in unproductive, and in several cases, in entirely worthless real estate, so it cannot be recalled as the law requires (40 *N. Y.*, *supra*). (*b*) The investments made are in nearly every case largely in excess of the amount that is sanctioned for trust loans by the law. A trustee should not loan more than one-half to two-thirds of

the value of the property (*Bogart* agt. *Vanvelsor*, 4 *Ed. Ch.*, 718–22, 23; 40 *N. Y., supra*; *Day. on Sur.*, 522). It may be improper to loan even two-thirds or one-half where buildings are used for trade (*Perry, vol.* 1, *p.* 549, *sec.* 457; *Lewin on Trusts* [*6th ed.*], 286). As when, as in this case, loans are made on a falling market. (*c*) A trustee should never loan on second mortgage (*Perry on Trusts, vol.* 1, *p.* 550, *sec.* 457; *Lewin on Trusts* [*6th ed.*], *p.* 291, *sec.* 40). (*d*) The law requires of a trustee that attention which a provident man should pay to business. It was improvident, therefore, being without experience himself in values, that he did not have some competent person estimate the value of each piece of property before placing the loan (3 *Red. on Wills*, 554, *secs.* 118 *a*, 559; *Perry on Trusts, secs.* 441, 442, 443, 444, *vol.* 1, *p.* 532, *&c.*; *Tiffany on Trusts, secs.* 570, 571; *King* agt. *Talbot*, 50 *Barb.*, 454, 484, 485). If trustees rely upon a valuation made by the mortgagor, or a surveyor, who is his agent, without having a survey of the value on behalf of the estate, it is a breach of trust; and they will be held liable for any deficiency in the value of the security (*Lewin on Trusts* [*6th ed.*], *p.* 286, *sec.* 25). Nor must he employ the solicitor of the borrower to fix upon the value or survey (*Lewin on Trusts* [*6th ed.*], *p.* 279, *sec.* 59). (*e*) Further evidence of appellant's incapacity by reason of improvidence from his investments, is in his making loans in a manner which might even leave them open to the objection at least of usury, thereby entailing difficulty and expense in their collection, litigation and delay. Results which were naturally to be expected in all, and did actually occur in some. This was conduct liable to render the estate unsafe and likely to be lost or diminished, and therefore within the statutory definition of improvidence (*Coope* agt. *Lowerre, supra*). It is no answer for the appellant to charge these derelictions upon C.; he knew of them, participated, allowed and encouraged them, and a trustee cannot give funds to a solicitor, and allow him to misapply them and then escape

Savage agt. Gould *et al.*

responsibility (*Brown's Accounting*, 16 *Abb.* [*N. S.*], 457 *and* 466, *and numerous cases cited ; Tiffany on Trusts*, 597, 570 ; 3 *Redf. on Wills*, 547, 548 ; *Perry on Trusts, vol.* 1, *sec.* 402).

IV. What proof would show that the appellant was incompetent to discharge the duties of this trust by reason of dishonesty? (*a*) Dishonesty as applied to persons is defined as, " Want of honesty, a disposition to deceive or betray, violation of trust, fraud, any deviation from probity or integrity " ( *Webster, Worcester*). All actual fraud is dishonest, and fraud, though unlimited by any precise definition, is any deception or artifice used to circumvent, cheat or defraud another (*Story's Eq. Jur., vol.* 1, *sec.* 186). Embezzlement is clearly dishonesty, and the neglect or refusal of an assent to account for trust property is embezzlement (*State* agt. *Leonard*, 6 *Cold.* [*Tenn.*], 307). So is the giving of a false account, or the willful omission to acknowledge receipts by a trustee or agent, and therefore dishonest (*Rex* agt. *Jones,* 7 *Car. & P.*, 834 ; *U. S.* agt. *Forsyth,* 6 *McLean,* 584; *Bachelder* agt. *Tenney,* 27 *Vt.*, 578). That whatever would constitute fraud would stamp its perpetrator as guilty of dishonesty, is a self-evident proposition. Fraud, says *Story* (*vol.* 2 *Eq. Jur., sec.* 187), properly includes all acts, omissions and concealments which involve a breach of legal and equitable duty, trust or confidence (*See, also, Bouv. Dict., vol.* 1, *p.* 612, *title "Fraud ; " Perry on Trusts, vol.* 1, *sec.* 169, *et seq. ; Gale* agt. *Gale,* 19 *Barb.*, 249–251 ; *Conkey* agt. *Bond,* 34 *Barb.*, 276 ; *Gould* agt. *Gould,* 36 *Barb.*, 270 ; It is the unlawful appropriation of another's property with knowledge, by design and without criminal intent (*Bouv., vol.* 1, *p.* 612). It must be such an appropriation as is not permitted by law, with knowledge that the property is another's and a design to deprive him of it. It is not in itself a crime, though it may be. (*Bouv. Dic., sec.* 4, *p.* 613). Dishonesty need not be criminal any more than fraud (*Livermore's Penal Law,* 739). It is indeed a part of the equity doctrine of fraud not to define it, or lay down specific rules as to the nature of

it, lest the craft of man should elude the rule.    But it includes all acts, omissions or concealments which involve a breach of trust and is injurious to another (*Bouv. Dic., p.* 613, *sub.* 7, *vol.* 1).    Dishonesty bears no resemblance to the word improvidence, as used here in the statute, in the necessity that it should characterize the trustee's conduct in general.    One dishonest act, however, is sufficient evidence of moral obliquity. One unmistakably intentional wrong, intending individual gain by unfair means at another's expense, would be clear evidence of that evil propensity and purpose which the law rightly deems it unsafe and injudicious to countenance in the character of trust custodians.    No one could deny that the person acting so was guilty of dishonesty.    This word does not even require that there should be a criminal intent (*Bouv., supra*).    A man is said to be honest who in his dealings with others does not violate the law (*Crabb's Synonyms,* 427). Dishonest marks the contrary to honest.    It is dishonest to take anything from another which does not belong to one (*Id.,* 430).    The meaning of dishonesty employed in this statute being manifest.

V. The appellant was incompetent to discharge the duties of this trust by reason of dishonesty, as appeared by the evidence.    First. He was so proved to be in the matters of his conversions of the estate and investments as left by the deceased.    The conversion of government bonds for investing on grossly insufficient security for bonus, was so manifestly a conversion of the highest security for corrupt motives, and solely for his own gain, regardless of the security of the trust fund, that it was dishonest and a violation of trust, a deviation from integrity, a circumvention of the objections to direct appropriation of the trust moneys in an illegal manner. Second. The appellant was shown incompetent by reason of dishonesty in his investments.    Third. The appellant was shown incompetent for the same reason, by his conspiracy with his partner to retain the moneys belonging to the trust estate.    The appellant and C. conspired to and did retain the

moneys of the estate to which they were not entitled. These
amounts which were taken as bonuses were really the moneys
of the estate which had never been invested. They never left
the hands of the appellant and his partner who was given the
money to "invest," &c. In each case they took their moneys
out of the fund that was to be loaned, so that in fact it never
was loaned, but remained the money of the estate in their
hands. In every one of these cases the bonuses belongs to
the estate (*Perry on Trusts, secs.* 429, 430, *vol.* 1, *p.* 517).
Now if the appellant had taken over $7,000 from the estate
and divided it between himself and Case, without any for-
mality, he would be clearly dishonest and guilty of embezzle-
ment. If he had taken it and pretended to give security that
was no security, he would be in no better position as regards
this appeal. Several of his loans were absolutely worthless,
so glaringly so that he must have known thereof. The proof
of a reckless conspiracy is strong and conclusive and establishes
his dishonesty (*Gale* agt. *Gale,* 19 *Barb.,* 249, 251). If a trustee
is guilty of a gross neglect of his duty to the estate, he will
be deemed guilty of a breach of trust (*Tiffany on Trusts,*
570, 571). A willful breach of trust is dishonesty. Fourth.
The appellant was shown incompetent for the same dishonesty
in the taking of usury. The taking of these bonuses even by
a trustee (sole) was usurious (*Van Wyck* agt. *Walters,* 16
*Hun,* 209; *Stout* agt. *Rider,* 12 *Hun,* 574; *Algur* agt. *Gard-
ner,* 54 *N. Y.,* 360; *Estevez* agt. *Purdy,* 66 *N. Y.,* 446;
*West. Life Ins. Co.* agt. *Kashan,* 66 *N. Y.,* 545; *Lee* agt.
*Chadsey,* 2 *Keyes,* 543). Here the trustee in many cases took
half of the bonuses and kept it without any cover whatever,
and in the balance of the cases he kept nearly half by having
it paid on liabilities against him which he would otherwise
have had to pay himself, and hoped and expected to get the
balance to make up his half of the entire bonuses. The tak-
ing of usury is a crime and the receiver is a criminal (2 *R. S.*
[*6th ed.*], *p.* 1166, *sec.* 15). The maxim "*ignorantia juris
non excusat*" need not be invoked, for the appellant was

himself a lawyer and betrayed a knowledge of this rule by his attempts to avoid the consequences. It remains for the trustee to explain these transactions. He has not done so. They were presumptively fraudulent (*Evans* agt. *Ellis,* 5 *Denio,* 640; *McCormack* agt. *Malin,* 5 *Blackf.,* 509, 523; *Dunlap's Paley,* 36; *Newman* agt. *Cordell,* 43 *Barb.,* 448; *Waverly Nat. Bank* agt. *Halsey,* 57 *Barb.,* 249). The taking of usury is an infamous crime, severely condemned by the laws both Divine and human. Its deliberate and professed violation cannot be other than dishonest. He has admitted the taking and division of these illegal bonuses in thirty-one different cases, and it has been proven in ten other cases, thus making forty-one mortgages where usury could be pleaded, amounting to $107,629.33. If it is a crime to take usury in loaning your own money how much the more criminal and dishonest it must be to lend or take usury upon loans made from trust moneys upon which the widow and five infant children of the deceased depend for their support and for the necessities of life. This is dishonesty of the worst character, and for which alone, if for no other reason, he should have been removed. Fifth. The appellant was shown incompetent by reason of his dishonesty in concealment of these bonuses received and divided between himself and C. of over $7,000, which belonged to the estate and should have been included in his accounts. As we argued above, they were funds of the trust which had never changed their character or been invested. (*a*) A trustee will not be permitted to make profit for himself out of the trust property; and he is equally prohibited from purchasing or dealing with it for his own gain (*Colburn* agt. *Morton,* 36 *How.,* 150–160, *Court App. and cases; Same Case,* 5 *Abb.* [*N. S.*], 308–316, *Court App.; Littlye* agt. *Beveridge,* 58 *N. Y.,* 592–606; *Fulton* agt. *Whitney,* 5 *Hun.,* 16; 3 *Red. on Wills,* 402, 403–553; *Story's Equity Jur.,* sec. 1277, *a; Levin on Trusts* [6th ed.], *p.* 243; *Van Epps* agt. *Van Epps,* 9 *Paige Ch.,* 237; *Kellogg* agt. *Wood,* 4 *Paige Ch.,* 578; *Holloway* agt. *Stevens,* 48 *How.,* 129). One who joins with him is also

disabled (*Sweet* agt. *Jacocks*, 6 *Paige Ch.*, 355). An usage authorizing an agent to make a profit upon his principal is a usage of fraud and plunder, and cannot be supported (*Diplock* agt. *Blackburn*, 3 *Campb.*, 43). A subordinate or agent of trustee is equally disqualified from making gains out of the estate, where it is to be shared in any way by the trustee (*Terwilliger* agt. *Brown*, 44 *N. Y.*, 237–240, 241, *affirming* 59 *Barb.*, 9 ; *Hawley* agt. *Cramer*, 4 *Cow.*, 717). Nor can the trustee or executor give it to one and then take back a part to himself. (*Powers* agt. *Powers*, 48 *How.*, 389). If he charged a bonus in his account for skill and services in conducting the business of the trust it will be set aside (*Perry on Trusts*, vol. 1, secs. 427, 428, 429, *and* vol. 2, sec. 904). No profit can be made by them for increase (3 *Rev. Stat.* [6*th ed.*], sec. 70, *p.* 101). Nor can his partner make any profits out of the trust funds, or for the performing of services, unless the partner alone takes the profits. Nor can either charge for professional services where both would share in the proceeds (3 *Redf. on Wills*, 556, sec. 118 ; 3 *Redf. on Wills*, 416, *note ; Collier* agt. *Munn*, 41 *N. Y.*, 143, 146 ; *Perry on Trusts*, vol. 1, *p.* 520, 521, sec. 432 ; *Lewin on Trusts* [6*th ed.*], *p.* 249, sec. 15 *and p.* 243). Whether usurious or not the trustee must account for all gains (*Perry on Trusts*, vol. 1, *p.* 571, sec. 468 ; 3 *Redf. on Wills*, 406, sec. 18). The rule in England and America is that a trustee must account for all profit he has made (3 *Redf. on Wills*, 402, sec. 10, 11 ; 403, sec. 12 ; 406, sec. 18 ; *Utica Ins. Co.* agt. *Lynch*, 11 *Paige Ch.*, 520). Trustee cannot even charge costs in an action against him personally for acts arising out of his attempts to protect trust property (*Pierson* agt. *Thompson*, 1 *Edw. Ch.*, 212). All these bonuses should have been accounted for and were property of the trust (*Perry on Trusts*, vol. 1, sec. 427, 428, 429, 430, *and sec.* 468, *p.* 571 ; *Tiffany on Trusts*, 554, 555, 556, 557, 558). (*b*) Being the moneys and profits of the trust, appellant refused to include them in account, appropriating them to his own use. His accounts, as filed in this

respect, were false. His omissions were willful. Failing to account for these receipts and convertly using them for himself and partner, was embezzlement and was dishonest (*Rex* agt. *Jones, supra, p.* 40 ; *U. S.* agt. *Forsyth, supra, p.* 40 ; *Bachelder* agt. *Tenney, supra, p.* 40). This comprised thirty-two different items, total $7,400.31 ; each item retained was a dishonest act, in taking, in concealing, in using and in refusing to account for and pay over. Seventh. Every department of the appellant's administration as it proves him incompetent by reason of improvidence, shows like proof of his dishonesty. These delinquencies are linked together. His improvidence in conversions, loans and investments, in selling good securities and taking poor or worthless mortgages afforded the opportunity for his dishonest practices and gains. None other would. It was because of his improvidence in loaning that borrowers who were receiving more than the entire value of their security could afford to give appellant and his partner the excess as payment of the large bonuses they exacted, and the evidence of Savage's improvidence is the source and center of his dishonesty. This case comes before this court for review upon the merits. Was this removal justified by principles of equity, is the question ? This is in the nature of a rehearing in equity (*Robinson* agt. *Raynor*, 28 *N. Y.*, 494 ; *Gilman* agt. *Gilman*, 3 *Hun*, 22, *and cases cited, p.* 25 ; *Kyle* agt. *Kyle*, 4 *N. Y. Weekly Dig.*, 120 ; *Sup. Court Rules, No.* 42, *note* 12 ; *Redfield Pr. Sur. Court, p.* 465).

BOARDMAN, *J.*— Edward Savage was removed by the surrogate of Albany county as executor and trustee under the will of John Gould, deceased, because he was "incompetent to discharge the duties of such office as executor, and such trust as trustee, by reason of improvidence and dishonesty in the administration of said trusts, office and estate."

The mass of evidence and the conceded facts are conclusive against the said Savage. He is shown to be incompetent in that he has delegated to others the judgment and discretion

which, by his acceptance of the trusts, was due from himself. He has allowed his law partner to manage the trust estate for his own benefit.   He has taken second mortgages in violation of his duty as executor and trustee.   He has taken inadequate security, when ordinary care, judgment and competency would have protected the estate.   He has converted the best of securities to invest in the poorest bonds and mortgages.

These acts and others which might be recited, convict Savage of incompetency to administer upon such an estate or discharge such trust duties.   The funds in his hands are wasting away through his negligence, carelessness and ignorance, or dishonesty and improvidence.

There is additional evidence which satisfied the surrogate of his dishonesty.   He has used the trust funds to secure his own profit, and has sought, by means condemned by law, to secure a pecuniary benefit to himself.   He has charged to borrowers a bonus or commission on sums loaned, and put the same, or a part thereof, into his own pocket.   He has exposed the securities taken, to the suspicion of usury; not to the benefit of the estate, but himself.   The estate has been managed for his own benefit, and he has deliberately made a profit out of it, when the making of such profit or gain exposed the estate to the greatest risks of loss, some of which have already occurred, and many of which will in all propability ensue. His reckless improvidence, his incompetency, and his acts outside of the sanction of the law, have involved the estate in litigation and charged it with costs.   Litigation and costs must almost inevitably ensue in may other cases in the future.

This court is satisfied the charges for which Savage was removed by the surrogate are abundantly sustained by the evidence.   The interests of the estate and of the *cestui que trust* demand his removal.   A continuance of the conduct of Savage in the future, as in the past, could only result in remediless disaster to the estate and the beneficiaries.   Entertaining these views, we concur upon the merits that Savage was justly removed from his offices as executor and trustee.

It is urged, however, upon this appeal that the surrogate had no jurisdiction to remove Savage from his position as testamentary trustee for dishonesty. It is conceded that the surrogate could remove him for incompetency.

We have already shown that he was incompetent, in our opinion, to exercise these trusts. That incompetency is not shown in one or two isolated instances, as in *Emerson* agt. *Bowers* (14 N. Y., 449), but by a long series of reckless, improvident and foolish acts to the serious danger and detriment of the estate. We might safely stop here, and upon this ground alone sustain the surrogate's decision.

But it seems quite clear, also, that the learned surrogate was correct in considering the evidence of dishonesty and including that in the reasons for his removal.

As the law existed in 1871, the surrogate could have removed an executor when " he had become incompetent to serve." At that time (1871) power was given him to remove testamentary trustees " in the same manner as now provided " for the removal of executors (1 *Laws of* 1871, *p.* 1010). By chapter 79 of Laws of 1873, page 159, the Revised Statutes were amended so as to include dishonesty in the cases for which an executor might be removed from office. The amendment of 1873 did not affect the manner in which an executor could be removed. That remained the same as before. It added another cause for removal, and therefore the Revised Statutes included such cause for removal, which was equally applicable to executors, testamentary trustees or guardians. The amendment modified the statute as of a date prior to 1871, so that the power to remove testamentary guardians under the act of 1871 could be exercised in case of incompetency by reason of drunkenness, dishonesty, improvidence or want of understanding. The authority to remove is only found in the act of 1871, but the cases in which the power might be exercised were within the province of legislative amendment. An amendment of the Revised Statutes, under such circumstances, causes the act of 1871 to take

effect in virtue of the amended law, and be controlled by it as so amended. Such seems to us to be the purpose of the two statutes and the natural object of the legislature (*Dawson agt. Horan*, 5 Barb., 459).

It is not necessary to consider the exceptions taken upon the hearing. There is no substantial conflict in the evidence. The inferences from it are irresistible. There can be no two opinions as to the facts established. Whether they constitute evidence of incompetency by reason of dishonesty or improvidence may, perhaps, be debatable, though we do not hesitate in our own opinion in that respect. Hence these rulings now complained of could not, by possibility, have changed the result or lead to the establishment of facts at variance with those concededly established by the case.

We think the decree of the surrogate is just, and should be affirmed, with costs against Edward Savage personally (*Same* agt. *Same*, No. 132 on calendar.)

This case presents the same identical questions upon the removal of Savage as guardian, and upon the same evidence.

The decree in this case is also affirmed, with costs against Edward Savage personally.